WOLLMAN, Circuit Judge.
Robert Dean Carter applied for disability insurance benefits and supplemental security income under the Social Security Act. An administrative law judge (ALJ) denied his application, concluding that Carter was not disabled because he did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments and because Carter had the residual functional capacity (RFC) to, perform a limited range of sedentary work. The Appeals Council denied Carter’s request for review. Carter later died, and his daughter, KKC, sought judicial review of the denial of disability insurance benefits. KKC now appeals the district court’s[1] judgment affirming the denial of benefits. We affirm.
I. Background
Carter was born on July 21, 1978. He had an eleventh-grade education and had past relevant work experience as a waiter, a cook, an electrician helper, a fast-food manager, and a fast-food worker. Carter had been a heavy smoker, but after being diagnosed with congestive heart failure, he reduced the number of cigarettes he smoked from two Or three packs per day to approximately ten cigarettes per day.
Carter applied for disability insurance benefits and supplemental security income on March 18, 2011, alleging a disability onset date of July 15, 2009. Carter stopped working on May 2, 2010. He claimed that heart failure and reliance on a defibrillator rendered him disabled. According to function reports completed by Carter and his fiancée in August 2010, Carter was able to prepare meals, play with their children, wash clothes and dishes, drive, play video games and cards, watch television, and visit friends. • Carter and his fiancée also stated that Carter became exhausted easily and could not stand for more than half an hour at a time.
A. Heart Failure
■ On July 29, 2009, Carter was admitted to the hospital because of shortness of breath after minimal exertion. He was discharged a week later, having been diagnosed with chest pain, dilated cardiom-yopathy, congestive heart failure, mitral regurgitation, nonsustained ventricular tachycardia, and hypertension. Carter’s left ventricular ejection fraction (EF) was twenty percent. Carter eventually resumed working full time' at a fast-food restaurant.
On May 3, 2010, Carter was admitted to the Iowa Heart Center Hospital because of chest pain, fatigue, and shortness of breath. His EF had dropped to ten percent. The attending physician referred Carter to the University of Iowa’s heart transplant program, but advised that Carter would not be eligible for a heart transplant unless he quit smoking and underwent psychiatric evaluation. Carter had a defibrillator implanted on May 6, 2010, and was discharged the next day. Carter did not return to work after his hospitalization.
On May 26, 2010, Jennifer Goerbig-Campbell, M.D., of the University of Iowa Heart and Vascular Center, began treating *367 Carter and evaluating his candidacy for advanced heart failure therapies. Carter reported a gradual decline in his physical capacity since his July 2009 diagnosis. He stated that he had stopped working because he could not stand for more than two hours a day. Carter explained that he could walk three blocks, but that he became lightheaded . and short of breath when engaged in household activities like cooking, washing dishes, or picking, up toys. He also reported that he had .trouble sleeping and . in controlling his anger. Dr. Goerbig-Campbell diagnosed Carter with nonischemic cardiomyopathy. She believed that Carter’s .heart failure was advanced, but explained that he would have to quit smoking and seek mental health treatment to be considered for advanced heart failure therapies. She also advised Carter to seek dental care. Dr. Goerbig-Campbell eventually classified Carter as having stage C, New York Heart Association (NYHA) class III symptoms.
Carter returned to the University of Iowa for monthly appointments with Dr. Goerbig-Campbell and her staff. He reported that he was able to walk short distances, complete light housework, and care for his children, with some fatigue. Carter was deferred from advanced cardiac therapies in September 2010, however, because he had not quit smoking, established mental health care, obtained dental care, or scheduled a sleep study, despite repeated instructions to do those things. Carter thereafter missed several appoints ments. When he returned for appointments in December 2010 and January 2011, Carter complained of fatigue. The medical record from his May 2, 2011, appointment indicates that “[t]he most.activity [Carter] has done in the past couple months is walk a friend’s dog that weighs 40 pounds a block. He does feel tired after that, but no shortness of breath. He has 3 children ages 5, 6, and 12 who he is active with and also helps with school.”
B. Psychiatric Background .
In September 2010, Carter met with a psychiatrist, who characterized’ Carter’s anger management problems as intermittent explosive disorder. Carter initiated mental health treatment with a local provider in April 2011 and regularly attended counseling sessions through June 2011. Progress notes from the counseling sessions indicate that Carter' had intact insight and judgment, good memory and eye contact, and appropriate impulse control. In late April, he was diagnosed with generalized anxiety disorder, social phobia, and mood disorder. He was prescribed psychiatric medications, and he reported at his follow-up appointment that he was “not worrying as much, sleeping better, having increased patience, and decreased irritability.” He had passed a GED pre-test and helped a neighbor fix her bike. After his June 2011 appointment, Carter did not return for treatment until late October 2012, when he reported feeling angry and not sleeping well. ' His medication was then adjusted.
C. Psychiatric and Medical Evaluations
On November 2, 2010, Carter met with Richard Martin, Ph.D., who conducted a psychiatric examination upon referral by Iowa Disability Determination Services. According to Dr. Martin, Carter “showed generally adequate effort and motivation throughout,” but “focused on portraying himself as having extreme anger problems, and appeared prone to exaggerate his claimed problems.” Carter reported being able to drive, prepare simple meals, and complete all self-care tasks independently. Dr. Martin opined that Carter met some of the criteria of intermittent explosive disorder and that he might have difficulty main *368 taining concentration, but that Carter had sufficient intellectual abilities to handle a wide range of unskilled work. Philip Laughlin, Ph.D., completed a psychiatric review technique form on December 13, 2Q10, and found that Carter did not suffer from any severe mental impairment. Russell Lark, Ph.D., completed a mental RFC assessment on June 14, 2011, finding that Carter had some moderate limitations, but that Carter was “able to complete simple, repetitive to moderately complex tasks,on a sustained basis.” Dr. Lark concluded that Carter suffered from generalized anxiety disorder, social phobia, and intermittent explosive disorder.
Lawrence Staples, .M.D., completed a physical RFC assessment on December 15, 2010. He opined that Carter could lift up to ten pounds, that he could stand for two hours and sit for six hours in an eight-hour workday, and that he had certain postural and environmental limitations. Dr. Staples gave controlling weight to Dr. Goer-big-Campbell’s opinion that Carter’s “impairment, is in Stage C, NYHA functional class 3 heart failure.” Matthew Byrnes, D.O., completed a physical RFC assessment on May 18, 2011. Dr. Byrnes concluded that Carter could lift or carry ten pounds occasionally and less than ten pounds frequently, that he could stand for at least two hours and sit for at least six hours in an eight-hour workday, and that he had certain postural and environmental limitations.
D. Social Security Proceedings
Carter’s claim for disability insurance benefits and supplemental security income was denied initially and on reconsideration. At Carter’s 'request, a hearing was held before an ALJ on October 10, 2012. Carter testified that-he could not stay at his fast-food job- due to the required standing and that he could not do a job that involved sitting due to anxiety. A vocational expert also testified.' The ALJ asked the vocational expert to consider a hypothetical individual who could perform sedentary work[2] that required no climbing and occasional stooping, crouching, kneeling, and crawling. Further, the individual had to work in a climate-controlled, indoor environment. Finally, the individual could perform simple routine, repetitive work that did not require close attention to detail, the use of independent judgment, or contact with the general public. The vocational expert testified that such ah individual could perform the representative sedentary unskilled jobs' of bench assembler, addresser, and order clerk.
The administrative record included Carter’s medical and psychiatric records, medical and psychiatric evaluations, and function reports by Carter and his fiancée. It also included a letter dated September 23, 2010, from Dr. Goerbig-Campbell indicating her support for Carter’s request for disability benefits. The ALJ allowed Carter to supplement the record after the hearing. ' Carter submitted a letter, wherein his attorney had asked Dr. Goer-big-Campbell to indicate her agreement with the statement, “[Y]ou have explicitly ordered [Carter] to refrain from any work, including sedentary work, as well as any other activities, since any slight physical exertion or mental stress could affect the precarious condition of Mr. Carter’s *369 heart.” Dr. Goerbig-Oampbell declined to agree with the statement, noting instead that Carter’s heart failure was severe but that she could not attest to his condition after May 2011, when he was last treated by providers at the-. University of Iowa Heart and Vascular Center.
The ALJ’s November 29, 2012, opinion described the five-step sequential evaluation process that he conducted in determining whether Carter was disabled.[3] The ALJ found that Carter met the first two steps of the analysis: he had not engaged in substantial gainful activity since April 1, 2010, and his impairments— heart failure, explosive disorder, anxiety disorder, and social phobia — were severe. At step three, the ALJ determined that Carter did not have an impairment or combination of impairments that met or medi'cally equaled one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Accordingly, the ALJ proceeded to the fourth step and found that Carter could not return to his past relevant work. The ALJ determined, however, that Carter maintained the RFC to perform sedentary work with certain limitations.[4] At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Carter could perform. The ALJ thus denied Carter’s application for disability insurance benefits and supplemental security income. The Appeals Council denied Carter’s request for review, making the ALJ’s decision the final decision of the Commissioner.
Carter died of end-stage cardiomyopa-thy on May 2, 2014, following which KKC continued the appeal from the denial of disability insurance benefits. The district court affirmed, concluding that substantial evidence on the record as a whole supported the ÁLJ’s determination that Carter was not disabled/
II. Discussion
We review de novo a district court’s decision to uphold the denial of social security benefits. Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir.2015). Our review of the Commissioner’s decision is deferential, and we will affirm “if it is supported by substantial evidence on the record as a whole.” Id. (internal quotation marks and citation omitted). “Substantial evidence is less, than a preponderance, but is enough that & reasonable mind would find it adequate to support the Commissioner’s conclusion.” Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir.2000). While we ‘take into account evidence that detracts from the decision, we will not reverse merely “because substantial evidence also exists in the record that would have supported a contrary outcome, or because we would have decided the case differently.” Andrews, 791 F.3d at 928 (internal quotation marks and citation omitted).
A. Listing 4.02
KKC argues that the ALJ committed an error at step three, of the se *370 quential analysis by finding that Carter did not meet or equal the criteria of the chronic heart failure listing. To qualify for disability benefits at step three, a claimant must establish that his impairment meets, or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir.2004). An impairment meets a listing only if it “meet[s] all of the specified medical criteria.” Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). “An impairment that manifests only some of those criteria, no matter how severely, does not qualify.” Id. To prove that an impairment or combination of impairments equals a listing, a claimant “must present medical findings equal'in severity to all the criteria for the one most similar listed impairment.” Id. at 531, 110 S.Ct. 885.
KKC argues that Carter’s impairment met the listing for chronic heart failure, Listing 4.02, which has two parts: A and B.[5] Listing 4.02 provides that “[t]he required level of severity for [chronic heart failure] is met when the requirements in both A andB are satisfied.” 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.02. It is undisputed that Carter met the requirement in part A, which demands medically documented evidence of systolic failure with ejection fraction of thirty percent or less during a period of stability. See id. § 4.02(A). The ALJ determined, however, that Carter’s impairment did not satisfy part B. KKC argues that the ALJ erred in finding that Carter’s impairment did not meet the criteria in part B(l) or part B(3).
Substantial evidence supports the ALJ’s finding that Carter’s impairment did not meet section 4.02(B)(1), which requires a claimant to establish the following:
Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom [a medical consultant], preferably one experienced-in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual!.]
KKC cites evidence that Carter was limited in his ability to perform activities of daily living, bút the record likewise includes evidence that Carter was able to complete such activities. Carter was. able to drive, shop for groceries, and play video games and cards. He could take care of himself, look after his children, and help care for pets. Although housework caused Carter to become fatigued, he was able to prepare simple meals, vacuum, wash dishes, do laundry, take out the trash, and pick up toys. The record also is devoid of any evidence that a medical consultant had concluded that an exercise test would have presented a significant risk to Carter.
Substantial evidence also supports the ALJ’s finding that Carter did not meet section 4.02(B)(3), which requires a claimant to establish an “[i]nability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less,” Carter underwent two exercise tests. The results from the July 7, 2010, test indicated a V02 max per kilogram of 26.3, which is equivalent to 7.5 METs. See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 4.00(C)(5). The results from the' December 13, 2010, test reflected a V02 max per kilogram of 21, which is equivalent to 6 METs.[6] Id. Ac *371 cordingly, Carter did not satisfy the criteria set forth in section 4.02(B), and his impairment did not meet Listing 4.02. See Zebley, 493 U.S. at 530, 110 S.Ct. 885.
B. Treating Physician
KKC argues that the ALJ erred by refusing to give controlling weight to the opinion of Carter’s treating physician. A treating physician’s opinion is given controlling weight if it “is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant’s] case record.” 20 C.F.R. § 404.1527(d)(2); see also SSR 962p, 1996 WL 374188, at *2 (Social Security Administration, July 2, 1996). According to KKC, Dr. Goerbig-Campbell’s letter in support of Carter’s application for disability benefits, together with her diagnosis that Carter had stage C, NYHA class III heart failure, compel a finding Carter was disabled. We disagree..
In her September 2010 letter, Dr. Goer-big-Campbell expressed her support of Carter’s application for disability benefits and stated that Carter “ha[d] significant physical limitations due to symptoms of lightheadedness, fatigue, decreased exercise tolerance, shortness of breath and muscle aches.” The ALJ acknowledged the letter, but declined to give it controlling weight because (1) the question whether Carter was disabled constituted a legal determination reserved for the Commissioner, (2) the letter did not set forth Carter’s functional limitations, and (3) Carter’s medical treatment records indicated that he was able to. complete activities consistent with limited sedentary work.
We conclude that the ALJ did not err in according limited weight to the letter. Dr. Goerbig-Campbell’s statement that she supported Carter’s benefits application did not resolve, the legal issue whether Carter was disabled under the Social Security Act. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir.2004) (“[Treating physicians’ opinions are not medical opinions that should be credited when they simply state that a claimant 'cannot be gainfully employed, because they are merely opinions on the application of the statute, a task assigned solely to the discretion of the Commissioner.” (internal quotation marks and citation omitted)); 20 C.F.R. § 404.1527(e)(1) (“A statement by a medical source that you are ‘disabled’ or ‘unable to work’ does not mean that we will determine that you are disabled.”). Moreover, the ALJ considered Dr. Goer-big-Campbell’s. opinion that Carter had significant physical limitations, but found it to be unhelpful in determining Carter’s RFC because Dr. Goerbig-Campbell had not identified specific functional limitations. Instead, Carter’s medical records were instructive because they referred to specific activitiés that Carter could and could not complete.
KKC next argues that Dr. Goerbig-Campbell’s diagnosis of Carter as having stage C, NYHA class III supports a finding that Carter was disabled. Stage C heart failure means that the patient has *372 structural heart disease and has had symptoms of heart failure. Heart Failure Stages & Functional Classifications, Emory Healthcare, emoryhealthcare.org/heart-failure/learn-about-heart-failure/stages-classification.html' (last visited Mar. 14, 2016). Class JII indicates that the patient has marked limitation of physical activity and is comfortable at rest, with less than ordinary activity causing symptoms. Id. Although a classification of stage C, NYHA class III heart failure could support a finding of disability, Carter’s classification did not require the ALJ to make such a finding in this case. The ALJ gave weight to Dr. Staples’s opinion that, even with such a classification, Carter maintained the RFC- to perform some work. The ALJ fairly determined that sedentary work with certain limitations was consistent with Carter’s classification, his medical records, and the function reports written by Carter and his fiancée. •
KKC argues that the record is, at a minimum, unclear whether Carter was disabled. She contends that the ALJ should have sought further information from Dr. Goerbig-Campbell regarding Carter’s functional limitations, or ordered a consultative examination. Although an ALJ has a responsibility to “neutrally develop the facts,” he does not “have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.” Stormo, 377 F.3d at 806 (citing Snead v. Barnhart, 360 F.3d 834, 838-39 (8th Cir.2004)). Carter’s medical records, function reports, and testimony indicated that he had the RFC to perform limited sedentary work. Moreover, the ALJ accepted the supplemental information from Dr. Goerbig-Campbell that Carter submitted after the hearing. That information did not list and substantiate specific functional limitations, however, nor did Dr. Goerbig-Campbell agree with the statement that she had ordered Carter “to refrain from any work, including sedentary work.” The ALJ did not have a duty to seek additional information from Dr. Goer-big-Campbell, nor was he required to order an additional consultative examination. See 20 C.F.R. § 404.1519a(b) (stating that a consultative examination may be purchased when' the evidence as a whole is insufficient to support a decision on the claimant’s 'claim).
C. Residual Functional Capacity
KKC argues that the ALJ improperly substituted his own opinion about the medical evidence in determining Carter’s RFC. We disagree, for the ALJ properly applied the medical evidence in the record to determine Carter’s ability to function in the workplace. See Stormo, 377 F.3d at 807 (“The ALJ is responsible for determining a claimant’s RFC, a determination that must be based on medical evidence that addresses the claimant’s ability to function in the workplace.”).
In determining Carter’s RFC, the ALJ considered the evidence in the record. The ALJ recounted Carter’s medical history and found that Carter had reported being able to complete activities consistent with limited sedentary work. During his first appointment with Dr. Goerbig-Camp-bell, for example, Carter reported-that he could not stand for more than two hours a day. Accordingly, the ALJ limited Carter to sedentary jobs. Carter consistently had reported that he was able to walk some and complete household cliores, albeit with fatigue. The ALJ thus limited Carter to jobs with a similar level of exertion and posturing as the activities of daily living that he was able to complete. The ALJ also considered Carter’s diagnosis of stage C, NYHA class III heart failure, finding that although that diagnosis indicated symptoms of heart failure with less-than- *373 ordinary exertion, “sedentary work would eliminate most occasion for exertion on.the part of the claimant.”
The ALJ found that the activities listed in Carter’s function report indicated .that Carter had “some minimal ability to be on his feet [and] also use his hands to complete objectives while sitting.” The ALJ noted that, after completing' the function report, Carter had “received little more treatment for his heart condition.” The ALJ interpreted this minimal treatment and the gap in treatment from May 2011 until the time of the hearing as indicating that Carter’s condition had remained stable.
Moreover, Carter testified that the reason he could not perform a sit-down job was because of anxiety — not because of physical exertion. The ALJ found that Carter’s contention that the stress resulting from a sit-down job would further affect his heart was undermined by his-work history, his infrequent treatment for mental health, and the results of his psychological consultative examination. The ALJ accounted for Carter’s mental impairments by limiting Carter to jobs that did not require him to have contact with the public and that involved simple, routine, repetitive work that did not require close attention to detail or use of independent judgment.-
We conclude that the ALJ’s RFC assessment was supported by substantial evidence on the record as a whole.
III. Conclusion
The judgment is affirmed.

. The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

. “Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.” 20 C.F.R. § 404.1567(a).

. The five steps are; (1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work;- and (5) whether the claimant can adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(4).

. The ALJ set forth the following limitations on Carter's sedentary work: only occasionally could Carter stoop, crouch, kneel or crawl; he could never climb ladders, ropes, of scaffolds; he could work only in a climate-controlled, indoor environment; he was limited to simple, routine, repetitive work that did not require close, attention to detail or use of independent judgment; he could not be required to complete tasks that involved contact with the public.

. KKC has argued that Carter’s impairment met Listing 4.02, She has made no separate, substantive argument that his impairment or combination of impairments medically equaled Listing 4.02 or any other listing.

. Both exercise tests were performed during his alleged period of disability and after his defibrillator was implanted. Neither indicated a workload equivalent to 5 METs or. less. The results from those tests were timely for *371 twelve months after the date on which the tests were performed. See 20 C.F.R. Pt. 404, Subpt, P, App. 1, § 4.00C(9)(a).
KKC argues that the record should have included results from a more recent test. She theorizes that the ALJ did not order an additional exercise test because the Social Security regulations forbid purchasing an exercise test for a claimant, like Carter, who has an implanted cardiac defibrillator. See id. § 4.00C(8)(a)(3). The regulations, however, do not necessarily require recent test results to be. part of the record: An exercise test will not be purchased if a determination can be made 'based on the evidence in the record, see id. § 4.00C(9)(d), and the ALJ fairly concluded that the evidence before him was sufficient to determine that Carter was not disabled.