# United States Court of Appeals
## For the Eighth Circuit
No. 18-3418

Angela Noerper

*Plaintiff - Appellant*

v.

Andrew Saul, Commissioner, Social Security Administration

*Defendant - Appellee*

————————

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

————————

Submitted: September 25, 2019
Filed: July 8, 2020

————————

Before KELLY, MELLOY, and STRAS, Circuit Judges.

————————

MELLOY, Circuit Judge.

Angela Noerper appeals the district court's dismissal of her petition for review following the Social Security Administration's ("Commissioner") denial of her application for disability insurance benefits and supplemental security income. The Commissioner determined she suffered multiple physical and mental impairments but retained the residual functional capacity ("RFC") to perform light work with

limitations as to standing, walking, gripping, concentrating, and following complex instructions. Noerper argues the RFC determination lacks the support of substantial evidence. She also argues the Commissioner failed to adequately develop the record.

Although the record provides ample support for determinations regarding the severity and limiting effect of most of Noerper's impairments, further development is required as to the functional limitations on walking and standing. Accordingly, we reverse and remand.

I.

Noerper previously worked as a waitress, a laborer at a tree nursery, and an unskilled carnival worker. In 2009, when she was 44, she was in a car accident. She has not engaged in substantial gainful activity since 2010. Noerper had worked for sufficient periods of time to be insured through December 31, 2015, filed her application for benefits on February 13, 2014, and alleged a disability onset date of August 16, 2010. Following denial of her application on initial review and on reconsideration, she received a hearing before an administrative law judge ("ALJ").

The ALJ determined Noerper suffered the severe impairments of degenerative joint disease in her knees, affective disorder, fibromyalgia, carpel tunnel syndrome, arthritis, and plantar fasciitis. The ALJ concluded none of these impairments met, or were medically equivalent to, a listed impairment. The ALJ then determined Noerper retained the RFC "to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b)" in that:

> She can lift or carry 20 pounds occasionally and 10 pounds frequently.
> She can stand or walk for 6 hours in an 8-hour workday. She can sit for
> 6 hours in an 8-hour workday. She can frequently push or pull in the
> limits for lifting and carrying. She can occasionally climb ramps and
> stairs but she should not climb ladders, ropes, or scaffolds in a work

setting. She can occasionally balance, stoop, kneel, crouch, and crawl. She should not do repetitive forceful gripping. She should avoid concentrated exposure to cold temperatures and vibration. She can understand, remember, and carry out simple repetitive work tasks and instructions at a specific vocational preparation . . . 2 level.

The ALJ concluded Noerper could not perform her past relevant work, but that jobs consistent with her limitations at the level of light work existed in substantial numbers in the national economy.

Because we find Noerper's appeal presents a close case only as to her degenerative knee condition, we focus our discussion of the evidence largely on this condition.[1] First, an MRI of her right knee from 2008 showed deteriorated cartilage at the most severe grade for the applicable classification system (Grade IV chondromalacia). The MRI also showed fluid in Noerper's right knee. Following her car accident in 2009, Noerper received medical treatment for unconsciousness, a fractured clavicle, collapsed lungs, and multiple fractured ribs. Then, there is a gap in her records between 2009 and 2013. In general, she does not identify a strong connection between her car accident and her allegedly disabling physical impairments, but she describes difficulty in remembering things since the accident.

Starting in April 2013, her records reflect more continuous treatment for her mental health issues, foot pain, carpal tunnel, and joint conditions. She visited treating physician George Patton, M.D., several times in 2013 primarily for carpal tunnel, fibromyalgia, and mental health issues. Records of these visits do not

---

[1]Although our detailed discussion is targeted, we have considered her arguments and the record as a whole as to all of her impairments and their cumulative effect upon her limitations. See Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) ("When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments.").

specifically address knee pain as a reason for seeking treatment. But, as possibly relevant to her knees, records reflect a history of arthralgia, "gait WNL [within normal limits]," and "osteoarthrosis, gen., multiple sites."

She visited treating physician Gregory Maynard, D.O. in 2013. Records from visits in September, October, and November 2013 reflect treatment primarily for carpal tunnel syndrome and plantar fasciitis, but they also reference "chronic discomfort due to arthralgias," a medical history of arthritis, and current complaints related to degenerative joint disease. Records describe her pain as to the degenerative joint disease as "mild" with the treatment listed as a prescription for a nonsteroidal anti-inflammatory drug (indomethacin) in pill form up to three times daily as needed for pain.

She received treatment through an organization named ARCare several times in 2014. Records from these visits indicate generalized chronic pain and several mental health concerns but do not focus on knee pain specifically. Records possibly relevant to her knee condition indicate a diagnosis of osteoporosis.

Noerper was seen again several times in 2014 by Dr. Maynard and Nurse Practitioner Vicki Adamick for depression, anxiety, osteoporosis, chronic foot and hand pain, and degenerative joint disease. Most visits were focused primarily on mental health concerns. In late July 2014, Adamick ordered a continuation of indomethacin, again for "Pain, Mild," and Dr. Maynard ordered the same in December 2014.

Most pertinent to Noerper's current arguments, she saw primary care physician James Wilkerson, M.D., from December 2014 through February 2016, and orthopedist Stanley Jones, M.D., in February 2015. In December 2014, Dr. Wilkerson noted that Noerper stated she had been scheduled for arthroscopic surgery but was unable to have the surgery and had gained weight, which "worsened

-4-

treatment." Dr. Wilkerson noted that she weighed 221 pounds and her knee pain was "somewhat chronic." He recommended nonsteroidal anti-inflammatory drugs, and, like her prior care providers, prescribed indomethacin. Noerper does not point to medical evidence in the record regarding the referenced suggestion of arthroscopic surgery.

Dr. Wilkerson saw Noerper again in January 2015. In describing her history, he relayed that he was unable to obtain records of her prior MRI but that she reported her knees were worsening with her left knee worse than her right. Examination showed both knees were normal with full range of motion and no swelling but with tenderness in the medial capsule. Dr. Wilkerson ordered knee imaging and continued her prescription for indomethacin.

X-ray imaging from January 26, 2015, showed soft tissues within normal limits in her left and right knees, and probable subchondral cysts in both knees, "joint spaces preserved" in her left knee, and no fluid on her left knee. The reviewing physician noted: "No acute findings. Degenerative changes are present in the patellofemoral compartment bilaterally."

An MRI of her left knee from January 28, 2015 (which noted comparison to the January 26, 2015 images) is central to Noerper's argument on appeal. The MRI showed damage to the cartilage under her kneecap (labeled "tricompartmental chondromalacia") which was "marked" in her patellofemoral compartment, moderate in the medial compartment, and mild in the lateral compartment. It also showed multiple points of ligament or tendon disease, moderate fluid on her knee and a moderate to large Baker's cyst.

Noerper saw Dr. Jones (the orthopedist) on February 6, 2015. His treatment notes indicate Noerper reported: (1) left knee pain, (2) her knees were just bad and she had knee problems "for a long time," (3) she twisted her knee in the shower

-5-

approximately one month prior to her appointment, (4) she had never had knee injections, and (5) she was scheduled for arthroscopic surgery but had to cancel due to insurance problems. Treatment notes also indicate Noerper reported that her pain was "mild" and was "aching; stabbing; deep; constant," and that she experienced "weakness; swelling; popping/clicking; grinding."

Dr. Jones's examination showed right and left knee swelling and genu valgum deformity (knock-knee deformity). Her left knee exhibited tenderness at multiple locations upon palpitation, but her right knee did not. Her right knee had a normal range of motion and strength but with pain and crepitus (grating sound) at the extreme limits of the range of motion. Her left knee had a somewhat limited range of motion, with crepitus and pain at the extreme limits of motion, with Dr. Jones reporting "flexion 3/5" and "extension 3/5." Her left leg did not show normal strength, instead showing weakness in her quadriceps and hamstring. Dr. Jones administered cortisone injections for both knees, prescribed a Medrol dose pack (a corticosteroid to be taken at home), ordered a long leg hinged knee brace, and recommended physical therapy.

In his final assessment and plan, Dr. Jones noted a recent (70 pound) weight gain and indicated the weight gain had caused Noerper's knee pain to worsen. He concluded that "she is already on anti-inflammatory, we'll not give this patient any narcotics. I am concerned with this patient's outcome based on the fact she did discuss with my nursing staff trying to obtain disability for her problems at such a young age."

In March 2015, Noerper returned to the general practitioner, Dr. Wilkerson. He indicated in the history section of his notes that she had received injections from the orthopedist, "[d]id better initially," and had been "advised to have therapy, but insurance wouldn't pay for this." In late April 2015, she again saw Dr. Wilkerson. She reported "some benefit" to her earlier injections from Dr. Jones and requested additional injections. Dr. Wilkerson administered lidocaine injections to both knees.

In June 2015, she returned to Dr. Wilkerson. She had gained an additional twenty pounds and complained of chronic back pain. She reported that her knee pain was worse because she had been using stairs more often and asked for surgery on her knees. In August 2015 she again saw Dr. Wilkerson. She had lost fifteen pounds, but reported that her knees had "flared up" and that she had fallen and injured her right knee. He again administered injections in both knees.

Finally, she continued to see Dr. Maynard throughout 2015 primarily for carpal tunnel treatment. When Dr. Maynard referenced knee issues he consistently referenced the issues as osteoarthritis and indicated she was seeing an orthopedist. At one visit, June 25, 2015, he prescribed an opioid patch, buprenorphine, to be applied once per day for seven days. Again, he labeled the issue being treated as osteoarthritis. He prescribed the same buprenorphine patches again in September and December 2015.

In addition to the medical evidence, Noerper described her knee pain in her hearing and application. In general, she testified that her knees hurt all the time, her left knee is worse than her right, she cannot walk or stand in the same place for very long, and she uses a cane at home. In addition, she stated that anytime she moves her knee, it "crunches back and forth." She reported that she received cortisone shots that "seem[e]d to help a little."

The record also contains a November 2014 assessment by a consulting physician, Dr. Jung, M.D., who reviewed Noerper's medical records. Dr. Jung indicated in an RFC analysis that Noerper could stand or walk for 6 hours in an 8-hour workday. His November 2014 assessment did not and could not reference the latter treatment records from Drs. Wilkerson and Jones. Dr. Jung's report, in fact, said little regarding Noerper's knees. His explanation in this regard stated simply, "Claimant has no evidence of back . . . or knee problems or limitations . . . . Exams have been [within normal limits] in these areas."

Then, the ALJ, in examining Noerper's testimony and medical records, stated:

[T]he claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effect of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . .

Regarding her knees, the most recent bilateral x-rays showed only mild medial compartment joint space loss. Physical and neurologic examinations have generally revealed a normal station and gait, and intact sensation, motor strength, and muscle tone in the legs. Despite the findings noted on the MRI from 2015, knee examinations from around that time showed full motion in both knees with no swelling, good stability, and no erythema. While the claimant testified that she used a cane to assist with ambulation, she did not present with one to the hearing, and there is no prescription for one in the record. Thus, the undersigned does not find a cane medically necessary. . . .

Also persuasive is the level and effectiveness of treatment. While she was reportedly unable to undergo surgery secondary to insurance problems, she has reported improvements in pain with injections in her feet, knees, and hands for up to two months. . . . combined with her generally normal station and gait, these factors further support the claimant's ability to stand and walk consistent with light work.

Based on the RFC quoted above, the ALJ determined Noerper was not disabled. In reaching the conclusions as to a RFC concerning the ability to stand and walk, the ALJ did not explain how he translated his understanding of Noerper's physical symptoms into the conclusion that she could stand or walk for 6 hours of an 8-hour workday. The Appeals Council denied further review, and the ALJ's decision serves as the Commissioner's final decision. The District Court affirmed the Commissioner's decision. Noerper appeals.

II.

"We review de novo a district court decision affirming a denial of social security benefits and uphold the [Commissioner's] decision if substantial evidence supports [the] findings." Strongson v. Barnhart, 361 F.3d 1066, 1069 (8th Cir. 2004). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017). Our review pursuant to the substantial evidence standard is not one sided. Rather, "[w]e consider the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id. Finally, "[i]f substantial evidence supports the Commissioner's decision, we may not reverse even if we might have decided the case differently." Strongson, 361 F.3d at 1070.

Ultimately, the RFC determination is a "medical question," that "must be supported by some medical evidence of [Noerper's] ability to function in the workplace." Combs, 878 F.3d at 646 (quoting Steed v. Astrue, 524 F.3d 872, 875 (8th Cir. 2008)). But, the RFC is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) ("A medical source opinion that an applicant is 'disabled' or 'unable to work,' however, . . . is not the type of 'medical opinion' to which the Commissioner gives controlling weight."). "[A]lthough medical source opinions are considered in assessing RFC, the final determination of RFC is left to the Commissioner," id., "based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations," Combs, 878 F.3d at 646 (citation omitted) (alteration in original). Similarly, the underlying determination as to the severity of impairments is not based exclusively on medical evidence or subjective complaints. Rather, regulations set forth assorted categories of evidence that may help shed light on the intensity,

persistence, and limiting effects of symptoms.[2]  Similar factors guide the analysis of whether a claimant's subjective complaints are consistent with the medical evidence. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (listing factors such as: "the claimant's daily activities," "the duration, frequency and intensity of the pain," "precipitating and aggravating factors," "dosage, effectiveness and side effects of medication," and "functional restrictions").[3]

---

[2]In identical terms, 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) list "Factors relevant to . . . symptoms, such as pain, which [the Commissioner] will consider":

(i)     Your daily activities;
(ii)    The location, duration, frequency, and intensity of your pain or other symptoms;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v)     Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi)    Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii)   Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

[3]In Polaski and cases that followed, we examined subjective complaints with reference to a claimant's credibility.  Social Security Ruling 16-3p eliminates use of the term "credibility" and clarifies that the Commissioner's review of subjective assertions of the severity of symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between subjective assertions and the balance of the record as a whole.  SSR 16-3p applies to Noerper's case, but it largely changes terminology rather than the substantive analysis to be applied.

Here, Noerper argues the ALJ misconstrued the record and, as a result, failed to adequately develop the record. According to Noerper, these combined errors led to an ultimate RFC determination unsupported by substantial evidence. For example, she argues the 2015 x-rays and MRI and the contemporaneous treatment notes from Drs. Wilkerson and Jones paint dramatically different pictures of her condition. In this regard, she argues the ALJ impermissibly relied on conclusions from Dr. Wilkerson, a primary care physician, rather than conclusions from Dr. Jones, the orthopedist. She correctly characterizes Dr. Jones's notes as more detailed. She also correctly points out that, contrary to the ALJ's finding that she possessed a full range of motion in both knees and normal strength in both legs, Dr. Jones described limited strength and limited range of motion with her left knee. She characterizes Dr. Wilkerson's conclusion that she suffered mild degenerative arthritis as failing to account for the pain and resulting limitations associated with her "marked" loss of cartilage as described by Dr. Jones.

In general, the agency is to place more weight on the opinions of specialists over generalists where opinions conflict and evidence does not otherwise provide reasons for rejecting the specialist's opinion. See 20 C.F.R. § 404.1527(c)(5). Here, we agree with Noerper that the record lacks meaningful justification for favoring Dr. Wilkerson's opinion over Dr. Jones's opinion. At a minimum, the ALJ did not explain the reasons for discounting Dr. Jones in favor of Dr. Wilkerson, and the ALJ failed to acknowledge the limitations on strength and range of motion discussed by Dr. Jones.

Noerper further argues that the ALJ impermissibly relied on descriptions of Noerper's gait, station, and sensation because observations as to these matters spoke to neurologic functioning rather than orthopedic or arthritic limitation. She also argues the ALJ overstepped his authority when concluding that her cane was not "medically necessary." We disagree with Noerper's interpretation of the ALJ's opinion as to both of these arguments. While it is true that the comments as to

station, gate, and sensation were listed as neurological observations, such matters speak generally to Noerper's physical abilities and remain relevant to the overall assessment of Noerper's functionality. And, although it is not the role of the ALJ to make determinations as to the medical necessity of actual medical treatment or palliative self-help treatment or assistive devices, the ALJ correctly noted that the cane was not prescribed by a medical care provider. Further, whether medically prescribed or not, the ALJ noted that Noerper did not present with a cane at her hearing. While perhaps referenced in inartful terms, the ALJ was not prohibited from considering the neurological observations or the use of the cane. See Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) ("[A]n arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome." (citation omitted)).

But, just as the ALJ failed to acknowledge certain evidence, Noerper fails to acknowledge evidence that lends support to the ALJ's conclusions. For example, Noerper relies strongly on the diagnosis of cartilage deterioration as shown in her 2008 MRI (right knee) and 2015 MRI (left knee). The record, however, appears devoid of references to either knee between 2009 and 2013. In later records, she consistently described her left knee as worse than her right knee. It would not be unreasonable to view this gap and the later focus on her left knee as suggesting right knee pain was not functionally limiting for several years after the alleged disability onset date. Further, it is clear that the injections referenced toward the end of her treatment records provided some degree of pain relief. And, although Noerper described her pain as worsening and received narcotics from Dr. Maynard in the second half of 2015, records (including records as late as February 2015) indicate that she repeatedly described the pain as "mild." In fact, Dr. Jones declined to prescribe Noerper narcotics due to the fact that his concerns as to her mindset outweighed his assessment of her physical condition. Looking at the record as a whole, the degree to which the loss of cartilage imposes functional limitations on Noerper is not self

-12-

evident. As such, it does not carry the seemingly conclusive weight that Noerper argues the ALJ was required to assign to it.

At the end of the day, although most of the record can properly be characterized as mixed—which normally would require that we affirm under the substantial evidence standard—we agree with Noerper that the record is fatally lacking in one respect. There is simply no reliable evidence providing a basis for the specific conclusion that Noerper can stand or walk for 6 hours in an 8-hour workday. In reaching this result, we do not suggest that an ALJ must in all instances obtain from medical professionals a functional description that wholly connects the dots between the severity of pain and the precise limits on a claimant's functionality. Something, however, is needed. See Combs, 878 F.3d at 646 ("The ALJ 'may not simply draw his own inferences about plaintiff's functional ability from medical reports.'" (quoting Strongson, 361 F.3d at 1070)). Here, the closest the record comes to supporting the 6-hour determination is the report of consulting physician Dr. Jung. That report, however, predated the majority of the treatment records concerning Noerper's knee conditions. We conclude that the absence of evidence to suggest the accuracy or propriety of the 6-hour limitation demonstrates that the ALJ did not fulfill the duty to fully develop the record.

In this regard, we note that the duty to develop the record arises from the simple fact that the disability determination process is not an adversarial process. See Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004). Accordingly, the Commissioner's duty exists alongside the claimant's burden to prove her case. Id. In fact, the Commissioner's duty exists even when a claimant is represented by counsel. Id. We have repeatedly recognized this duty, and we have remanded for further development not only where evidence of functional limitations is lacking, but also where the record presents conflicting medical opinions as to which the Commissioner fails to explain a choice. See, e.g., Combs, 878 F.3d at 646 (remanding for further development where ALJ failed to explain the selection

between two doctors' disparate descriptions of a claimant's functional limits). Here, the absence of evidence translating the medical evidence and subjective complaints into functional limitations, coupled with the failure to address or resolve the differences between the medical opinions of Drs. Wilkerson and Jones leaves us unable to determine the permissibility of the Commissioner's RFC determination. Cf. Brown v. Colvin, 825 F.3d 936, 940 (8th Cir. 2016) (addressing development of the record in reference to a listed impairment rather than an RFC determination, stating that "[t]he ALJ did not mention, much less resolve, the seemingly inconsistent results obtained from . . . two . . . tests. . . . In light of these inconsistent . . . test results on a 'crucial issue,' as well as the ALJ's failure to accurately describe the medical evidence in the record . . ., we are unable to determine whether substantial evidence on the record as a whole supports the ALJ's finding" (citation omitted)).

We reverse and remand to the district court with instructions to return this matter to the Commissioner for further proceedings consistent with this opinion.

STRAS, Circuit Judge, dissenting.

In my view, there was enough in the record for the Administrative Law Judge to conclude that Angela Noerper can stand or walk for up to six hours in an ordinary workday. Because we have everything we need to affirm, I respectfully dissent.

_____