# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2999
_____

Christopher Brad Bonham

*Plaintiff - Appellant*

v.

Frank Bisignano, Commissioner of Social Security

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Western District of Missouri
_____

Submitted: September 16, 2025
Filed: June 2, 2026
_____

Before LOKEN, KELLY, and ERICKSON, Circuit Judges.
_____

LOKEN, Circuit Judge.

Christopher Bonham is a veteran with a long history of neck and back problems. In May 2012, following his military service, these problems worsened, and he complained to his primary medical care provider at the Department of Veterans Affairs (VA). Medical imaging in July showed cervical spondylosis with a herniated

disk at C6-C7, causing neural foraminal stenosis.[1]  A neurosurgeon performed a comprehensive exam.  Based on the medical imaging and severe pain Bonham was experiencing, the neurosurgeon decided surgery was appropriate.  Bonham had C6-C7 spinal fusion surgery in October.  In 2016, after repeated trips to the emergency room and to various doctors for treatment, Bonham underwent a VA Compensation and Pension physical examination performed by Jon Keller, a physician's associate (PA), who concluded Bonham was unable to use his left arm.[2]  The VA granted him limited disability benefits.

## I.

After relying on VA benefits for five years, Bonham applied to the Social Security Administration (SSA) for Social Security disability benefits in 2021, alleging a disability onset date of May 12, 2012.  As his insured status expired in 2016, he was eligible for SSA disability benefits from May 12, 2012 to December 31, 2016.  He continued to receive VA benefits.

Bonham's disability application alleged several severe impairments, including degenerative disk disease, cervical spondylosis, left ankle pain, hypertension, sinus problems, unspecified depressive disorder and alcohol abuse.  In July 2022, SSA

---

[1]Foraminal stenosis occurs when the spinal cord narrows and causes compression of the spinal nerves. Cleveland Clinic, Foraminal Stenosis, https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis.

[2]PAs generally undergo three years of further education after obtaining their undergraduate degree, with no residency requirement.  Am. Acad. of Physician's Associates: Career Central, Become a PA https://www.aapa.org/career-central/become-a-pa/. Physicians attend four years of schooling after graduating college and three to seven years of residency and fellowship training.  Ass'n of Am. Med. Colls.: Aspiring Docs, MD and DO Programs, https://students-residents.aamc.org/media/9971/download.

Administrative Law Judge Jan E. Dutton (the ALJ) conducted an informal administrative hearing at which Bonham and a vocational expert (VE) testified. Bonham's testimony in support of his claim detailed the effects of his impairments during the period for which he is seeking SSA disability benefits, May 12, 2012 to December 31, 2016 -- that he was unable to use his left arm, as he told PA Keller in 2016; is almost bedridden; cannot bend down; and could only lift one two-liter bottle of soda in his left arm. Bonham presented no medical opinion evidence regarding his ability to perform work. Regarding the lack of medical opinion evidence, his attorney stated that Bonham's VA primary care doctor was asked to provide a medical opinion but responded, "he does not do those for VA." Counsel told the ALJ, and Bonham confirmed, that his VA disability benefits rating had increased to 80% in 2022. Counsel said, "I would not object . . . if you sent us out to an ME [medical examiner] . . . it's very possible he might meet or equal a listing for his neck." Cf. 20 C.F.R. § 404.1519a(b). The ALJ did not do so.

The extensive administrative record includes 1745 pages of Bonham's Outpatient Hospital records from September 2011 to December 2016, 19 pages of Emergency Department Records from October 2012 to May 2014, and two pages of a SSA Recent Medical Treatment form stating that Bonham had surgery in 2022 to replace disks C4-5 and will need another surgery to replace disk C3. Two SSA consulting doctors looked at Bonham's records and found there to be insufficient evidence to render an opinion about his functional abilities.

After the hearing, the ALJ issued a lengthy opinion denying the benefits application, applying the well-established five-step evaluation process set forth in the SSA regulations. See 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ found that Bonham had not engaged in substantial gainful activity during the relevant period, a key element of a disability claim. In steps two and three, the ALJ concluded that Bonham had severe impairments -- "degenerative disk disease and spondylosis of the

cervical spine with history of C6-7 fusion in 2012 and lumbar radiculopathy" -- but they are not listed impairments, so he was not disabled at step three. See 20 C.F.R. § 404.1520(d).

Steps four and five ask whether the claimant can still do his or her past relevant work and if not, whether "you can make an adjustment to other work." These steps each require an assessment of the claimant's residual functional capacity (RFC), see § 404.1520(a)(4)(iv)-(v), defined as "the most you can still do" in a "work setting . . . despite your limitations," 20 C.F.R. § 404.1545(a)(1); see Hensley v. Colvin, 829 F.3d 926, 931-34 (8th Cir. 2016). The ALJ found: "[b]ased on the totality of the evidence . . . the claimant was capable of performing a range of light work (i.e., lifting, carrying, pushing, or pulling 20 pounds occasionaly and 10 pounds frequently; standing and walking up to 6 hours in an eight-hour day and sitting up to 6 hours in an eight-hour workday)." However, the ALJ "limited the claimant to frequent [rather than constant] handling, fingering, and feeling and [only] occasional overhead reaching" and "avoiding concentrated exposure to hazards, secondary to chronic pain."

The VE testified that Bonham's past relevant work as an airline security representative, as generally performed, is defined as light work in the Dictionary of Occupational Titles. If Bonham had the RFC to perform the full range of light work, the SSA Medical-Vocational Rules would direct a finding of not disabled at step 4. See 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.13, 202.20. But Bonham described the work as he performed it as "heavy" or "very heavy" work because he lifted around 100 pounds constantly. Comparing Bonham's RFC "with the physical and mental demands of this work," the ALJ found he was able to perform *his* past relevant work as an airline security representative as it is generally performed and found he was not disabled at step four.

Turning to step five, the ALJ found that Bonham's ability to adjust to the demands of other work was impeded by exertional and nonexertional limitations that "erode the unskilled light occupational base." Accordingly, in posing an available work hypothetical to the VE, the ALJ modified the RFC to be considered:

> Q Specifically . . . this is an individual who could lift 20 pounds occasionally, ten pounds frequently, who could stand, sit, or walk for at least six hours in an eight-hour day. I'm going to say could use his arms for frequent not constant handling, fingering, and feeling and could do occasional overhead reaching. And should avoid concentrated exposure to vibration or hazards that would be heights or dangerous machinery or equipment. With that functional capacity, could such an individual return to the airline security job?
>
> A This hypothetical person could work as an airline security representative as generally but not actually performed.
>
> Q And how many of those [actually performed] jobs exist in the nation?
>
>          *    *    *    *    *
>
> A 38,300, Judge.
>
> Q In addition, would there be other work and if so, could you give three examples of other work at step five?
>
> A . . . This person could also work as a sample distributor. . . . There are 33,800 [jobs] in the national economy. This person could also work as a housekeeping cleaner. . . . There are 219,700 in the national economy. This person could also work as a ticket taker. . . . There are 133,900 in the national economy.
>
> Q . . . Is there any light factory or manufacturing work that would meet this hypothetical?

*   *   *   *   *

    A    The person could also work as a subassembler . . . light exertion. . . . There are 17,200 in the national economy.

The ALJ credited the VE's testimony; found that, despite his severe impairments, Bonham was not disabled at steps four and five; and denied his SSA disability benefits claim. Regarding PA Keller's "opinion evidence,"[3] the ALJ noted:

> The claimant underwent a compensation and pension evaluation in May 2016, which concluded that he is unable to use his left upper extremity due to muscle weakness. However, while the conclusion is supported by the findings of muscle atrophy with 0/5 muscle strength in the left elbow during that particular exam, it is not consistent with other exams during the relevant period, which showed between 3 and 5/5 muscle strength in the left upper extremity. Therefore, this opinion is not persuasive because it is not consistent with the other substantial evidence of record. (Record citations omitted.)

## II.

After the SSA Appeals Council denied further review, Bonham sought judicial review of the adverse final decision in the Western District of Missouri, arguing that remand to the agency is necessary because the record contains only one medical opinion -- P.A. Keller's exam -- that described Bonham's ability to function in a workplace. When the ALJ rejected that opinion, she did not sufficiently develop the

---

[3]Licensed PAs are now an "acceptable medical source" under the revised SSA disability regulations. See 20 C.F.R. § 404.1502(a)(8). Under the regulations in effect when Keller examined Bonham in 2016, their opinions could be considered but were not an acceptable medical source.

-6-

record and base her RFC determination on substantial evidence. The district court[4] upheld the denial of benefits:

> I understand the difficulty of this determination given the timeframe [Bonham's decision to wait five years before seeking SSA disability benefits], but the ALJ did the best they could and analyzed that medical finding and the functioning finding and compared and contrasted it with the other functioning findings that were in the record and documented those, and then found that the one medical opinion stemming from the zero-to-five muscle strength in the left elbow was not persuasive and consistent with the substantial evidence on the record as a whole for that timeframe. And so I'll affirm the decision on that basis.

Bonham appeals the district court's decision. We review *de novo* a district court's decision affirming the denial of benefits. Cropper v. Dudek, 136 F.4th 809, 813 (8th Cir. 2025). We affirm if the "ALJ made no legal error and the ALJ's decision is supported by substantial evidence on the record as a whole." Kraus v. Saul, 988 F.3d 1019, 1024 (8th Cir. 2021) (quotation omitted). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations." Biestek v. Berryhill, 587 U.S. 97, 102 (2019) (cleaned up). Substantial evidence "is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." Phillips v. Astrue, 671 F.3d 699, 702 (8th Cir. 2012) (quotation omitted). "[W]e will disturb the [ALJ's] decision only if it falls outside the available zone of choice." Austin v. Kijakazi, 52 F.4th 723, 728 (8th Cir. 2022) (quotation omitted). We do not reweigh the evidence. Schmitt v. Kijakazi, 27 F.4th 1353, 1361 (8th Cir. 2022) (citation omitted).

---

[4]The Honorable Stephen R. Bough, United States District Judge for the Western District of Missouri.

## III.

The ALJ denied Bonham's SSA disability claim at steps four and five of the SSA's sequential evaluation process because he has the RFC to perform his past relevant work as generally performed (step four) and to make an adjustment to other available work in the economy (step five).

In the "Statement of the Issues" section of his principal Brief, Bonham states that the issue on appeal is:

> Whether the ALJ violated the duty to develop the record and created an RFC that lacked the support of substantial evidence after rejecting the only medical opinion of record and without identifying evidence that illuminated Bonham's day-to-day ability to function in the workplace.

We agree with the government that "[t]he general issue presented is whether substantial evidence supports the Commissioner's final decision finding Bonham was not disabled." But we will address Bonham's attempts to avoid this deferential standard of review by arguing the ALJ committed purported errors of law.

**A.** Bonham argues that remand is necessary because the ALJ rejected PA Keller's medical assessment, the only medical opinion in the record that spoke to the claimant's ability to function in the workplace. By basing her decision on non-functional medical reports and clinical findings that did not assess his functional ability, Bonham argues, the ALJ relied on impermissible inferences about Bonham's ability to work and therefore violated her duty to develop the record and render an RFC determination that is supported by substantial evidence. It is certainly true that an ALJ does not have unfettered discretion to determine a claimant's RFC. Social security disability proceedings are non-adversarial, and the ALJ is responsible for developing the record fairly and fully. Cox v. Astrue, 495 F.3d 614, 618 (8th Cir.

2007). Therefore, the ALJ cannot render an opinion if a "crucial issue [is] undeveloped," but the ALJ has no duty to seek clarification of medical opinions if the record contains other detailed clinical evidence of the claimant's limitations. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

Bonham's contention is fundamentally contrary to the controlling SSA regulations. In 2017, after prolonged notice and comment rulemaking proceedings, the agency adopted Revisions to Rules Regarding the Evaluation of Medical Evidence. 82 FR 5844-01 (Jan. 18, 2017) (final rules). The revisions apply to disability claims filed after March 27, 2017, such as Bonham's. But one rule relating to evaluating medical evidence did not change. Like the prior regulation, which still applies to claims filed before that date, § 404.1545(a)(3) of the revised regulations continues to define the "[e]vidence we use to assess your residual function capacity":

> We will assess your residual functional capacity based on all of the relevant medical and other evidence. . . . We will consider any statements about what you can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. (See § 404.1513.) We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons.

Controlling Eighth Circuit precedents apply this standard. "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations." Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013) (quotation omitted). "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace. However, there is no requirement that an RFC finding be supported by a specific medical opinion." Hensley, 829 F.3d at 932

-9-

(cleaned up). For example, in Hensley, the ALJ determined the claimant's RFC by evaluating the relevant treatment records and the treating physician's "To Whom It May Concern" letter that detailed the claimant's pain, strength, and gait. We upheld the RFC determination notwithstanding the absence of a direct, "functional" medical opinion, deeming the "medical record adequately developed." Id. at 930-32.

Bonham argues that an RFC determination may not be based on inferences drawn from "objective medical data (e.g., clinical examinations, diagnostic imaging)." There must be "medical evidence," which he defines as a "medical professional's opinion," such as PA Keller's, "regarding Bonham's ability to function in the workplace" -- what he calls "functional evidence." This argument is directly contrary to § 404.1545(a)(3) and has no direct support in the cases he cites. The notion that there is no "functional evidence" in Bonham's extensive medical records is ludicrous. For example, during PA Keller's examination, Bonham claimed that he was not able to walk or stand, a claim he repeated at the hearing; Keller rejected this claim because Bonham did both at the evaluation. Consistent with § 404.1545(a)(3), the ALJ properly "assess[ed Bonham's] residual functional capacity based on all of the relevant medical and other evidence."

Bonham contends that two cases establish our "long-held position" that an RFC determination must be based on what he calls "functional medical evidence" -- Noerper v. Saul, 964 F.3d 738 (8th Cir. 2020), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). Neither case stands for this categorical proposition. In Noerper, a divided panel reversed the district court and remanded the Commissioner's denial of disability benefits for further factual development. 964 F.3d at 746-47. We concluded the mixed administrative record provided "simply no reliable evidence" supporting the ALJ's RFC determination that the claimant could stand or walk for six hours a day. A consulting physician's report that may have supported the RFC determination predated other records that told a starkly different story about the claimant's ability

to walk or stand. This decision dealt with the complete lack of supporting evidence, rather than the lack of a specific type of evidence. Id. The panel majority expressly disclaimed that it was creating a categorical rule: "[W]e do not suggest that an ALJ must in all instances obtain from medical professionals a functional description that wholly connects the dots between the severity of pain and the precise limits on a claimant's functionality. Something, however, is needed." Id. at 746. Section 404.1545(a)(3) and our earlier cases such as Hensley make clear that the "something" may be based on reliable objective medical data such as clinical examinations and diagnostic imaging and need not include a medical professional's opinion regarding the claimant's functionality.

Likewise, in Lauer, again a split panel decision, we reversed not because of the absence of functional evidence, but because the panel majority "located no medical evidence" at all to support the ALJ's RFC determination that the claimant's mental impairments limited only the degree to which he could interact with the public. 245 F.3d at 704. Ignoring medical assessments in the record, the ALJ noted that a neutral medical advisor "concurred" in the ALJ's RFC. But this medical advisor was an internal medicine specialist, not a neurologist; had never assessed the claimant's mental impairments; and admitted at the hearing that a full conclusion about the claimant's RFC was impossible without future tests the advisor never subsequently reviewed. Id. at 703-06. Again, not a categorical decision that an ALJ's RFC determination must be based on functional medical evidence rather than "objective medical data" from which an RFC can be inferred.

Properly understood, Noerper and Lauer reiterate our *actual* "long-held" position that an RFC must be based on some reliable medical evidence about the claimant's ability to function in the workplace, not that the evidence must be functional in-and-of-itself. Read in conjunction, these fact-intensive precedents establish no categorical rule regarding functional evidence.

**B.** Bonham further argues that the ALJ's RFC determination was not supported by substantial evidence because it was based on inferences impermissibly drawn from the objective medical reports, failed to identify some medical evidence of Bonham's ability to function in the workplace, and ignored medical evidence in the record supporting Bonham's reported limitations. Now we are into issues clearly governed by the substantial evidence standard of review in which we ask whether the administrative record contains sufficient evidence to support the ALJ's factual determination, disturbing the ALJ's decision only if it "falls outside the available zone of choice." Hensley, 829 F.3d at 932. On this issue, Bonham bears the ultimate burden of persuasion. Austin, 52 F.4th at 728.

The ALJ's lengthy opinion focused in great detail on the voluminous hospital medical records reflecting Bonham's condition and medical treatment during the disability period at issue. As this is a close case, we will summarize this extensive medical evidence in some detail:

After the C6-7 surgery in October 2012, Bonham's pain improved and his strength remained mostly strong. On December 15, 2012, he had equal grip strength bilaterally and good range of motion in his shoulders, with a limited ability to rotate his head to the right. In a January 24, 2013 visit, Bonham displayed full range of motion in all extremities and shoulders and equal strength bilaterally, with a slight decrease (4/5) in his left grip strength. One week later, Bonham returned to the doctor displaying significant weakness in his left triceps, but he acknowledged the surgery relieved his pain.

About six months after the surgery, Bonham claimed that his pain returned. The first post-surgery MRI in February 2013 displayed severe left neural foraminal stenosis at C6-C7 and spinal canal stenosis at C4-C5 and C5-C6. In August 2013, an MRI again showed severe neural foraminal narrowing at C5-C6 and C6-C7 but stable

fusion and unchanged degenerative findings.  In August 2014, an X-ray showed the prior fusion "look[ed] good."

Bonham received little to no regular treatment for his arm or neck from mid-2013 to 2015, often missing his neurosurgery appointments.  He repeatedly went to the ER and other doctors for pain and pain medication.  At these visits, the doctors conducted various tests that revealed consistent, if slightly varied or diminished, strength and mobility in his left arm.  The relevant findings were:

- May 18, 2013: bilateral upper extremities had full motor strength. The doctor noted Bonham displayed no weakness in his bilateral upper extremities but reported chronic numbness in his left hand and "uncontrolled" pain.  He displayed no limp.

- June 11, 2013: full range of motion in Bonham's neck but decreased grip strength in his left arm.  Due to pain, he was issued a "TENS" unit shortly thereafter.

- February 21, 2014: equal 5+/5+ strength in all extremities; no gross motor deficits.

- April 30, 2014: tested at a 5/5 in upper extremities; another report noted "slight" weakness in his upper left extremity; inspection of lower extremities "normal."  Pain level at 9 out of 10.

- May 15, 2014: 5/5 strength in all extremities; no sensory/motor deficits; good range of motion in his arms; neck range of motion limited.

- July 8, 2015: Bonham claimed 50% paralysis in his left arm. Exam results were 3/5 strength in left arm; good range of motion in all extremities but his neck; normal gait.

- July 14, 2015: while undergoing alcohol detox, returned to ER six days after his previous visit and three days after he voluntarily left against medical advice. Same results as the July 8 examination.

- August 10, 2015: "chronic weakness" of left arm; and could shrug his shoulders "some." Limited range of motion in his neck; slight weakness in left leg (4/5); normal knee flexion and extension; pain level at 4.

- August 14, 2015: full 5/5 strength in both his upper and lower extremities; normal muscle tone.

- October 15, 2015: 4/5 muscle strength in left elbow flexion, shoulder abduction, grip strength, left hip flexion, knee flexion/extension, and ankle dorsal flexion. Muscle atrophy in his left arm and limited range of motion in his neck. Pain level at 9/10.

The ALJ concluded, after a thorough and systematic review of these medical records and other evidence in the administrative record, that Bonham was not disabled. As required, the ALJ based her decision on ample medical evidence about Bonham's ability to function in the workplace. See Hensley, 829 F.3d at 932. The ALJ discussed Bonham's scans, finding that some support his complaints of pain and weakness but others showed stable degeneration. The ALJ discussed physical exams and tests during the relevant period, finding that -- unlike some scans -- they "often showed 5/5 motor strength and normal muscle groups and good range of motion in all limbs." The ALJ found that Bonham had the ability to use his left arm and was capable of performing a range of light work in the workplace. She recognized the objective medical and other evidence supporting Bonham's alleged chronic pain and symptoms, but concluded the record as a whole did not support the degree and

severity he alleged.[5]  She accounted for this evidence of reduced strength, upper extremity mobility, and pain by determining an RFC in the range of light work -- "lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently; standing and walking up to 6 hours in an eight-hour day and sitting up to 6 hours in an eight-hour workday" -- and then limiting Bonham "to frequent handling, fingering, and feeling and occasional overhead reaching" and "avoiding concentrated exposure to hazards, secondary to chronic pain."

This was not a determination lacking "some medical evidence of the claimant's ability to function in the workplace." Cox, 495 F.3d at 619.  It was a determination based on, and supported by, relevant objective medical reports, tests, and statements by medical sources that § 404.1545(a)(3) directs an ALJ to consider.

The ALJ also acknowledged that PA Keller reached a different conclusion regarding Bonham's ability to use his left arm in conducting his VA exam in 2016. She found this evidence unpersuasive because of its lack of consistency with other findings in the record: "[w]hile the conclusion is supported by the findings of muscle atrophy with 0/5 muscle strength in the left elbow during the particular exam, it is not consistent with other exams during the relevant period, which showed between 3 and 5/5 muscle strength in the left upper extremity . . . ."

_____

[5]Though Bonham claimed he was nearly bedridden, the ALJ found that medical "exams . . . demonstrated a normal gait, with no mention or indication that the claimant required the use of any assistive device."  Regarding use of his left arm, the ALJ found that "physical examinations were not entirely consistent with the severity and degree of limitation the claimant alleges."  When the ALJ "make[s] a factual determination that a [c]laimant's subjective pain complaints are not credible in light of medical evidence to the contrary," "we normally defer to . . . [that] determination." Grindley v. Kijakazi, 9 F.4th 622, 630 (8th Cir. 2021) (quotation omitted).

Under the revised regulations, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from your medical sources."  20 C.F.R. § 404.1520c(a).  The ALJ must evaluate the medical opinion according to the factors listed in § 404.1520c(c).  When the claimant on appeal argues the ALJ's findings are unpersuasive, our review under the substantial evidence standard is limited "to whether the ALJ adequately analyzed persuasiveness . . . not whether we agree with the ALJ's evaluation of the record evidence on these issues."  Cropper, 136 F.4th at 814 (citation omitted).  Accordingly, we uphold ALJ decisions that weigh conflicting medical evidence and reach a conclusion that does not comport with *all* the medical evidence.  See, e.g., Schmitt, 27 F.4th at 1361 ("[T]he ALJ provided legitimate reasons for discounting those opinions . . . .").

The ALJ thoroughly evaluated PA Keller's examination.  The ALJ acknowledged Keller's conclusion that Bonham could not use his left arm was "supported by the findings of muscle atrophy with 0/5 muscle strength in the left elbow during the particular exam."  However, the ALJ concluded, it was "not consistent with other exams during the relevant period, which showed between 3 and 5/5 muscle strength in the left upper extremity."[6]  This analysis complied with § 404.1520c and our standard for reviewing ALJ decisions that disregard or give little weight to disputed medical opinions. "We will not disturb an ALJ's decision merely because there is evidence supporting two inconsistent conclusions."  Cropper, 136 F.4th at 815 (quotation omitted).  The weighing of evidence "is ultimately . . . reserved to the [ALJ]."  Cox, 495 F.3d at 619.

---

[6]Notably, even Bonham's statements to PA Keller conflicted with his testimony before the ALJ.  During Keller's examination, Bonham claimed that his left arm was "useless," but at the hearing, Bonham testified that he could still lift a two-liter bottle of soda in his left arm during the relevant period.

The objective medical evidence on which the ALJ relied supported the modified light work RFC the ALJ adopted. After rejecting PA Keller's opinion evidence, the exams, tests, and medical source statements in the record were sufficient to meet the substantial evidence standard and no "crucial issue" remained undeveloped. The medical records are nearly 2,000 pages long, replete with Bonham's doctor and hospital visits and over a dozen physical exams that tested his left arm. These records are sufficient to find that Bonham had strength and mobility in his left arm and therefore could perform the functions required of a number of jobs available in the national economy, and very likely his past relevant work as well. The ALJ did not simply rely on her own inferences. Cf. Combs v. Berryhill, 878 F.3d 642, 646-47 (8th Cir. 2017). The physical exams and tests showed Bonham could use his left arm, and the ALJ's RFC reflected that. That this objective medical evidence did not directly address some of the things Bonham may do in performing his past relevant or other work in a workplace does not require a remand. An ALJ need not "obtain from medical professionals a functional description that wholly connects the dots." Noerper, 964 F.3d at 746. "[W]e limit our review under the revised regulations to whether the ALJ adequately analyzed persuasiveness . . . ." Cropper, 136 F.4th at 814. The ALJ's decision to give more weight to relevant objective evidence in the claimant's medical records than to a one-time exam by a PA does not create an unresolved issue that requires remanding for the development of additional evidence to resolve the inconsistency -- even when the claimant's attorney invites the ALJ to do so.

Moreover, in this case, as the district court recognized, there is strong reason to doubt that an additional expert on remand could render a reliable opinion regarding Bonham's ability to function in a workplace during a benefits eligibility period that *ended* almost ten years ago. Due to Bonham's five-year delay in applying for SSA disability benefits, and his failure to present medical opinion evidence at the administrative hearing, he failed to satisfy his burden to prove his RFC and therefore

the ALJ's finding that he was not disabled at steps four and five was in the acceptable "zone of choice" and must be upheld.

For the foregoing reasons, the judgment of the district court affirming the Commissioner's decision is affirmed.

KELLY, Circuit Judge, dissenting.

In determining Bonham's Residual Functioning Capacity, or RFC, the ALJ found that Bonham "was capable of . . . lifting, carrying, pushing, or pulling 20 pounds occasionally and 10 pounds frequently; standing and walking up to 6 hours in an eight-hour day and sitting up to 6 hours in an eight-hour workday[.]" Because there is not sufficient evidence in the record to support these findings—and thus insufficient evidence to support the RFC—I respectfully dissent.

In 2012, Bonham had surgery on his spine following a large disc herniation that his doctor noted "correlated to rather profound triceps weakness and hand intrinsic weakness." Doctors told Bonham that his spine condition had "killed 50 percent of the muscle in [his] arm" before surgery and, even with surgery, Bonham's symptoms returned in full force after about six months. From 2012 to 2016, Bonham continued to receive medical care from treating clinicians who documented Bonham's evolving symptoms. As the ALJ noted, Bonham's medical records show his left-side strength ranged from 0/5 to 5/5 during that time. But importantly, those strength measurements referred to different parts of his anatomy. Sometimes they referred to his left side as a whole. Other times, they referred to specific muscles, muscle groups, or movements, such as the left triceps, left shoulder abduction, elbow flexion, grip strength, deep tendon reflexes, or left hand. The medical evidence also documented problems with Bonham's hip, knee, and ankle flexion and sensation in his left leg, among other things.

The ALJ relied on the numerical assessments of Bonham's strength in determining his lifting limitation, but no evidence in the record translates the medical records' strength and reflex ratings to pounds that Bonham could lift, carry, push, or pull.[7] Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017) ("The ALJ 'may not simply draw [their] own inferences about plaintiff's functional ability from medical reports.'") (quoting Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir. 2004)). Nor does evidence in the record correlate, for example, elbow flexion or grip strength to the particular movements involved in lifting, carrying, pushing, or pulling. And the ALJ found that Bonham could sit for up to six hours and stand for up to six hours because he had a normal gait—evidence only that he could *walk* normally, not sit or stand. See Noerper v. Saul, 964 F.3d 738, 746–47 (8th Cir. 2020) (reversing and remanding where there was "no reliable evidence providing a basis for the specific conclusion that [claimant] can stand or walk for 6 hours in an 8-hour workday").

As to his ability to lift, carry, push, or pull, Bonham testified that his dexterity was so limited on his left side that he could not hold a phone or soda can, could not tie his own shoes or buckle his belt, and could not wear clothing that had buttons. The most he could lift with his left arm was a two-liter bottle of soda and, even then, he could not do so with his hand alone—he had to use his whole arm, as if he were doing a bicep curl. As to his ability to stand, walk, and sit, Bonham testified that even just bending triggered his nerve problems, causing lower back pain, preventing him from bending again, and making him "pretty much bedridden." The longest he

---

[7]On appeal, Bonham cites a recent publication from the National Library of Medicine discussing the Medical Research Council Scale for Muscle Strength, which suggests a rating even as high as 3/5 represents only "[m]uscle activation against gravity," with no resistance—in other words, inability to lift any amount of weight. Usker Naqvi, Konstantinos Margetis, & Andrew L. Sherman, Muscle Strength Grading, Nat'l Libr. of Med. (Apr. 27, 2025), https://www.ncbi.nlm.nih.gov/books/NBK436008/. The record here is insufficiently developed to understand whether the clinicians who treated Bonham used this scale or a different one.

could stand without a break was 10 minutes, and he could not sit for more than 30 minutes at a time. While the ALJ retains discretion to assess whether Bonham's testimony was consistent with the medical evidence and evaluate its persuasiveness accordingly, see Ross v. O'Malley, 92 F.4th 775, 779 (8th Cir. 2024), the record here does not allow the ALJ to determine what the medical evidence actually says about Bonham's limitations. As a result, the ALJ lacked the ability to properly assess whether Bonham's testimony was consistent—or inconsistent—with the medical evidence.

In 2014, the VA determined Bonham was "permanently disabled" due to his combined health conditions, including ongoing problems resulting from injuries he sustained during his military service. Although the ALJ was not bound by that conclusion, see Noerper, 964 F.3d at 744 (medical opinions that an applicant is disabled or unable to work are not given controlling weight), the VA's decision was presumably supported by some medical evidence. Just two years later, as part of Bonham's compensation and pension evaluation, a clinician determined Bonham was "unable to use his left upper extremity." And, as the ALJ noted, "the State agency medical and psychological consultants did not render any opinions[.]" Both consultants wrote that "additional functional information is required to further evaluate the claim" and identified an "absence of functional data."

Recognizing this same deficit, Bonham twice asked the ALJ to send his file to a medical expert (ME) to review the evidence. Bonham's attorney explained that "there's no opinion evidence in this file" and "me not being an orthopedist, I can't—I'm just kind of reading what they're telling us." The ALJ stated they would take the ME request under advisement, but never addressed the request or explained why an ME would not be appropriate, beyond stating in the adverse determination that an "ALJ is not required to" request one. True, but the ALJ does have "a duty to develop the record." Noerper, 964 F.3d at 747 (noting that because "the disability

-20-

determination is not an adversarial process," "[w]e have repeatedly recognized" that the Commissioner shares a duty, alongside the claimant, to prove the claimant's case). I would reverse and remand this case to the ALJ for further inquiry as to the relevance of the findings in the medical records to Bonham's "ability to function in the workplace."[8] Combs, 878 F.3d at 647.

_____

[8]Because I would remand to the ALJ for further proceedings, I would not reach the issue raised in Part III.A. of the Court's opinion.